IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ROBERT SCHWERIN, II,

       Petitioner,               No. CIV S-02-0096 MCE GGH P

   vs.

MICHAEL KNOWLES, et al.,

       Respondent.         <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

I.  <u>Introduction</u>

       Petitioner is a state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1999 conviction for 25 counts of lewd and lascivious acts upon a child in violation of Cal. Penal Code § 288(a). Petitioner is serving a sentence of 56 years.

       Petitioner was also initially convicted of one count of continuous child abuse in violation of Cal. Penal Code § 299.5.  This conviction was reversed during petitioner's state habeas proceedings.

       This action is proceeding on the amended petition filed June 4, 2004, as to the following claims: 1) trial court violated petitioner's right to due process by permitting the prosecution to amend the information and add offenses not supported by the evidence presented

1

1    at the preliminary hearing; 2) the prosecution overcharged petitioner; 3) improper

2    admission of character evidence under Cal. Evid. Code §§ 1101(b) and 1108, and jury instruction

3    error; 4) ineffective assistance of counsel; and 5) prosecutorial misconduct.

4            After carefully reviewing the record, the court recommends that the petition be

5    denied.

6    II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

7            The AEDPA applies to this petition for habeas corpus which was filed after the

8    AEDPA became effective.  Neelley v. Nagle, 138 F.3d 917 (11th Cir.), citing Lindh v. Murphy,

9    117 S. Ct. 2059 (1997).   The AEDPA "worked substantial changes to the law of habeas corpus,"

10   establishing more deferential standards of review to be used by a federal habeas court in

11   assessing a state court's adjudication of a criminal defendant's claims of constitutional error.

12   Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

13           In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

14   Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

15   for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

16   between "contrary to" clearly established law as enunciated by the Supreme Court, and an

17   "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

18   to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

19   Court on a point of law, or (2) if the state court case is materially indistinguishable from a

20   Supreme Court case, i.e., on point factually, yet the legal result is opposite.

21           "Unreasonable application" of established law, on the other hand, applies to

22   mixed questions of law and fact, that is, the application of law to fact where there are no factually

23   on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

24   Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

25   AEDPA standard of review which directs deference to be paid to state court decisions.  While the

26   deference is not blindly automatic, "the most important point is that an *unreasonable* application

2

1  of federal law is different from an incorrect application of law....[A] federal habeas court may not

2  issue the writ simply because that court concludes in its independent judgment that the relevant

3  state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

4  that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

5  1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

6  objectively unreasonable nature of the state court decision in light of controlling Supreme Court

7  authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

8          The state courts need not have cited to federal authority, or even have indicated

9  awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

10 Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

11 contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

12 unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

13 occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

14 established Supreme Court authority reviewed must be a pronouncement on constitutional

15 principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

16 binding only on federal courts.  Early v. Packer, 123 S. Ct. at 366.

17         However, where the state courts have not addressed the constitutional issue in

18 dispute in any reasoned opinion, the federal court will independently review the record in

19 adjudication of that issue.  "Independent review of the record is not de novo review of the

20 constitutional issue, but rather, the only method by which we can determine whether a silent state

21 court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

22 2003).

23         The California courts issued reasoned decisions as to all of petitioner's claims but

24 for his ineffective assistance of counsel claim.  Accordingly, the court will independently review

25 the record in adjudication of that claim.

26 /////

III.  Factual Background

        The following background summary is contained in the opinion of the California Court of Appeal.  After independently reviewing the record, the court finds this summary to be accurate and adopts it below.

        An information charged defendant with a violation of section 299.5, continuous sexual abuse of a child (count I) and 25 violations of section 288, subdivision (a), lewd or lascivious acts upon a child (counts II-XXVI).  The information also alleged special allegations tolling the statute of limitations (§ 803, subds. (d) and (g)).  Defendant entered a plea of not guilty.

        Following a jury trial, the trial court declared a mistrial after finding the jury deadlocked.  A second jury trial followed.

        At trial, defendant's son Robert testified.  He and his sister Amber lived with their mother in Redding.  Robert is two years older than Amber.  At the age of eight, Robert began visiting defendant "about every other week."  Robert slept either in defendant's apartment or in defendant's camper.

        Robert witnessed several incidents between defendant and Amber.  In one incident, Robert opened the door of the camper to find defendant holding his exposed penis with Amber sitting in front of him. Robert told no one of the incident.

        Another time, Robert, Amber and defendant camped by a lake.  Robert saw defendant perform oral sex on Amber.

        Robert and Amber discussed defendant's behavior.  Amber told Robert defendant had intercourse with her, but asked him not to tell anyone.  Later, in 1997, when interviewed by police, Robert denied witnessing sexual contact between defendant and Amber.

        At age 14, Amber confided in her 15-year-old boyfriend Jeremy.  She told him she was forced to have sex with defendant from the age of six until she was 10.  Jeremy and Amber discussed the subject "a couple of times."

        A friend of Amber's, Shanna, testified when they were about 10 years old Amber told Shanna that defendant had touched her.  Shanna asked Amber what she meant and Amber stated defendant had molested her.  Amber asked Shanna not to tell anyone.  The two girls discussed the molestation at least 20 times.  Shanna encouraged Amber to tell her mother about the molestations, but Amber refused, saying it would upset her mother.  Another childhood friend testified Amber told her of the molestation in the summer between fourth and fifth grades.

        In 1991, a mother of one of Amber's classmates contacted police about the molestation.  Amber told her classmates she had been raped at knifepoint by defendant several times.  The police were unable to substantiate the report and the investigation was dropped.  During a police interview, Amber denied the abuse.

Amber's mother Linda testified she was separated from defendant when she was four months pregnant with Amber.  The couple briefly reconciled, then permanently separated.  While defendant lived in Redding, Robert and Amber visited him occasionally.  When defendant moved to Dunsmuir, the children visited him every other weekend.

During this period, Amber wanted to wear full-length, one piece pajamas, which her mother found odd given the warm weather.  Amber did not want to bathe and seemed very glad to come home from the visits.

Linda never suspected defendant had molested Amber until, in 1997, she overheard a telephone conversation between Amber and defendant's current wife.  Amber wept as she spoke and Linda asked what was wrong.  Amber told her mother defendant had molested her.  Amber was upset and apologetic and Linda did not ask for any details.  Linda contacted the police. [Footnote 2]

> [Footnote 2: Linda also testified concerning a prior molestation.  A 14-year-old neighbor molested three-year-old Amber and attempted to have intercourse with her.  Amber wrote an essay in second or third grade about the incident.]

Amber testified she began visiting defendant in Redding at age five or six.  During these visits, defendant would rub her buttocks when they went for a walk, which "didn't feel right."  This happened on 10 to 15 occasions.

In 1990, defendant moved to Dunsmuir.  Amber testified she was unsure how many visits she made to Dunsmuir; she estimated 15 to 20 visits.  The visits usually lasted two nights.

Defendant's molestations followed a pattern. At night, defendant would enter the room where Amber slept with Stephanie, defendant's daughter from another union. [Footnote 3.]

> [Footnote 3: Stephanie was five years younger than Amber.]

Defendant would stand smoking a cigarette and, without waking Stephanie, would remove Amber's pajamas.  He would put his finger in her vagina or lick her vagina.  He penetrated her with his penis, ejaculating on her stomach.  Amber would pretend to be asleep.  Because she was afraid, she never screamed or cried out.  Sometimes defendant would use a condom.  The molestations occurred every weekend she visited defendant.  The parties stipulated defendant moved to Dunsmuir on June 1, 1990, and remained until May 31, 1991.

Amber recounted an incident beside a creek, when defendant licked her vagina and asked Robert "do you want to?"  On other occasions, defendant asked Amber to touch his penis, moving her hand up and down.

Amber never told her mother or defendant's current wife about the abuse.  Defendant told her no one would believe her and if she told her mother, her mother would stop loving her.  Defendant called the molestations "our secret."  Amber told only a few other children and asked them not to tell anyone.  She

thought she had done something wrong, and she deserved what was happening to her.

Initially when questioned by police, Amber denied any abuse.  She was too frightened to tell, afraid her mother wouldn't love her.  After her mother overheard Amber upset and talking to defendant's wife, Amber told her mother, "My dad raped me."  Amber testified she visited defendant every other weekend while he lived in Dunsmuir, and she never spent a weekend in Dunsmuir without defendant molesting her.

Defendant did not testify.  The defense presented testimony by several police officers who interviewed Robert in 1997, after Amber confided in her mother.  During these interviews, Robert denied witnessing sexual conduct between defendant and Amber.

Tammy S., defendant's wife of 14 years, testified.  She stated defendant suffered a back injury in 1987 and endured several surgeries which left him in a great deal of pain.  Defendant could not engage in sexual activity unless supine and experienced pain and impotence.  Tammy testified Robert and Amber only visited defendant and Tammy in Dunsmuir on four occasions.

The physician who examined Amber in 1988 for evidence of abuse testified.  The primary physical exam was considered "suspicious for sexual abuse."  However, a team review of photographs taken during the exam concluded Amber's genitalia were normal.  The physician testified a normal exam does not preclude full vaginal penetration seven years earlier.

Respondent's Answer to Amended Petition, Exhibit B, pp. 2-6.

IV.  Discussion

      A.  Claim 1: Amendment of Information

      Petitioner argues that the trial court violated due process by allowing the prosecution to amend the information to add offenses not supported by the evidence presented at the preliminary hearing.  The Sixth Amendment guarantees a criminal defendant the fundamental right to be clearly informed of the nature and course of the charges in order to permit adequate preparation of a defense.  See Shepard v. Rees, 909 F.2d 1234, 1236 (9th Cir. 1990).  The notice provision of the Sixth Amendment is incorporated within the Due Process Clause of the Fourteenth Amendment and is fully applicable to the states.  See Gray v. Raines, 662 F.2d 569, 571 (9th Cir. 1981).

/////

6

1    The felony complaint filed January 12, 1998, alleged that the offenses occurred
2  between April 1989 and April 1992.  CT at 1.  At the preliminary hearing, held June 10, 1998,
3  the prosecution presented testimony that petitioner had improper contact with Amber when she
4  was eight to ten years old.  CT at 25.  Amber was born on April 17, 1981.  CT at 24.  Therefore,
5  the abuse occurred between April 17, 1989, and April 17, 1992.  Petitioner lived in Dunsmuir
6  from June 1, 1990 to May 31, 1991.  Court of Appeal Opinion at 7.[1]  All of the improper contact
7  occurred while petitioner lived in Dunsmuir.  CT at 27.

8    Following petitioner's first trial, a mistrial was declared.  CT at 131.  Petitioner's
9  second trial began on February 16, 1999.  CT at 136.  On that date, the trial court granted the
10  prosecution's motion to amend the complaint to reflect the dates of the allegations as June 1,
11  1990, through May 31, 1991.  CT at 136.

12    Petitioner argues that allowing the prosecutor to amend the information violated
13  his constitutional rights because the jury could have convicted petitioner for offenses they found
14  had occurred after he moved away from Dunsmuir in November 1990—a time period excluded
15  by the testimony of the police officer at the preliminary hearing.

16    At the preliminary hearing and the second trial, the prosecution presented
17  evidence that petitioner molested Amber during the time he lived in Dunsmuir.  No evidence was
18  presented at the preliminary hearing or the second trial that petitioner molested Amber after he
19  left Dunsmuir.  Therefore, petitioner's ability to prepare a defense was not prejudiced by the
20  amendment to the complaint because the prosecution's theory regarding when the molestations
21  occurred was consistent in the preliminary hearing and the second trial.  No Sixth Amendment
22  violation occurred because petitioner had adequate notice of the charges against him.

23    Petitioner also cites state law in support of the instant claim.  Pursuant to the
24  AEDPA standards discussed above, this court applies clearly established Supreme Court

25  _____
26  [1] A police officer had testified that he "understood" petitioner had moved to Alaska in November 1990.  However, the parties stipulated to the correct dates.

1  authority in evaluating petitioner's claim.  Because the denial of this claim by the California

2  Supreme Court was not an unreasonable application of clearly established Supreme Court

3  authority, this claim should be denied.

4              B.  Claim 2: Overcharging

5              Petitioner next argues that he was denied due process by the prosecution's abuse

6  of power in arbitrarily overcharging the number of offenses.  Petitioner states that he was

7  originally charged with one count of continuing sexual abuse under Cal. Penal Code § 288.5, a

8  crime carrying a sentence of 16 years.  After the preliminary hearing, the prosecutor added 25

9  additional counts of child sexual abuse under Cal. Penal Code § 288(a), which resulted in a term

10 of 56 years.  Petitioner argues that the prosecution violated his right to due process by charging

11 him with so many separate counts pursuant to § 288(a).

12             In support of this claim, petitioner relies primarily on People v. Jones, 51 Cal.3d

13 294 (1990).  On direct appeal, the California Court of Appeal rejected this claim as follows:

> In People v. Jones (1990) 51 Cal.3d 294, the Supreme Court held that a child's
> inability to provide specific details regarding the time and circumstances of sexual
> abuse did not violate a defendant's due process rights.  The court stated, "It must
> be remembered that even generic testimony (e.g., an act of intercourse 'once a
> month for three years') outlines a series of specific, albeit undifferentiated,
> incident, each of which amounts to a separate offense, and each of which could
> support a separate criminal sanction.  (*Of course prosecutors should
> exercise discretion in limiting the number of separate counts charged.  No valid
> purpose would be served by charging hundreds or thousands of separate counts
> of molestation, when even one count may result in a substantial punishment.*)" (Id.
> at p. 314, italics within parentheses added.)
>
> Here, evidence at the preliminary hearing alleged that "at least a hundred,
> probably more" separate incidents of sexual abuse occurred.  The prosecution, in
> the information alleged 25 separate violations of section 288, subdivision (a).  In
> Jones, supra, 51 Cal.3d 294, the court implied an abuse of discretion might be
> found if a prosecutor charged hundreds or thousands of separate counts.  Twenty-
> five counts stemming from an alleged two-year period of molestation every other
> weekend does not represent the type of overcharging the Jones court warned
> against.  We find no abuse of discretion.

25 Respondent's Answer to Amended Petition, Exhibit B, pp. 9-10.

26 \\\\\

1    This court must apply the relevant Supreme Court authority in evaluating the

2    instant claim.  A prosecutor possesses broad authority when selecting a charge so long as there is

3    probable cause to believe the accused committed an offense defined by statute and the decision is

4    not based on an arbitrary classification.  Bordenkircher v. Hayes, 434 U.S. 357, 364, 98 S. Ct.

5    663, 668 (1987).  There is no evidence in the record that the prosecutor did not have probable

6    cause to believe that petitioner committed the charged offenses or that the decision was based on

7    an improper motive.

8    Accordingly, because the denial of this claim by the California Supreme Court

9    was not an unreasonable application of clearly established Supreme Court authority, this claim

10   should be denied.

11        C.   Claim 3: Improper Admission of Evidence and Jury Instruction Error

12   Petitioner states that evidence of uncharged sexual misconduct was admitted

13   under Cal. Evid. Code §§ 1101(b) and 1108.  Petitioner argues that the trial court failed to

14   perform the requisite balancing of probative value versus prejudice as required by Cal. Penal

15   Code § 352.  In order to succeed on this claim, which is based on a violation of state law,

16   petitioner must demonstrate an error involving "fundamental fairness."  Estelle v. McGuire, 502

17   U.S. 62, 73, 112 S. Ct. 475, 482 (1991) (in order for error in the state trial proceedings to reach

18   the level of a due process violation, the error had to be one involving "fundamental fairness").

19   The trial court admitted the following evidence of uncharged sexual misconduct:

20   During trial, the prosecution elicited testimony concerning four specific acts.  In
     the first, defendant pointed out a picture of a naked woman, spray painted on the
21   inside of a tunnel, to his children.  Defendant laughed and thought it was funny.
     Defense counsel made no objection to the admission of this evidence.
22

23   In the second incident, Robert testified defendant left pornographic magazines out
     for his nine-year-old son to see.  Defendant knew Robert looked at the magazines.
     Defense counsel failed to object.
24

25   The final incidents occurred on camping trips outside of Siskiyou County.  During
     a trip to Whiskey Town Lake, Robert testified he saw defendant perform oral sex

26   \\\\\

9

1    on Amber.  Amber testified defendant rubbed her genitals through a blanket
     during a family camping trip to Shasta County.  Again, counsel did not object.
2

3    Respondent's Answer to Amended Petition, Exhibit B, pp. 13-14.

4            The California Court of Appeal found that petitioner had waived his claim that the

5    trial court failed to sua sponte perform a balancing test:

6            Defendant contends the trial court erred in failing to balance probative value
             against prejudicial impact under Evidence Code section 352 before admitting the
7            evidence of uncharged sexual offenses.  However, as the People point out, in
             order to preserve an evidentiary error on appeal, the defendant must make a timely
8            and specific objection at trial.  (Evid. Code § 353, subd. (a).)  If a defendant fails
             to object to evidence based on Evidence Code section 352, defendant may not
9            raise the issue on appeal.  (People v. Kirkpatrick (1994) 7 Cal.4th 988, 1014-
             1015.)  Defendant's failure to object waived the issue on appeal.
10
             Defendant, in response, asserts "[a]s a foundational requirement for the admission
11           of character evidence, the Evidence Code section 352 balancing test must be
             performed sua sponte if not requested by the proponent of the evidence."
12           However, defendant offers no authority for this proposition.  The Supreme Court
             in People v. Falsetta (1999) 21 Cal.4th 903 upheld the constitutionality of
13           Evidence Code section 1108; the court did not impose a sua sponte duty to
             conduct an Evidence Code section 352 analysis whenever evidence of other
14           crimes is introduced–even in the absence of an objection to the admission of the
             evidence.
15

16   Respondent's Answer to Amended Petition, Exhibit B, pp. 15-16.

17           In the answer to the amended petition, respondent argues that petitioner's claim

18   challenging the trial court's failure to conduct a balancing test pursuant to Cal. Evid. Code § 352

19   is procedurally defaulted based on trial counsel's failure to object.  See Ylst v. Nunnemaker, 501

20   U.S. 797, 111 S. Ct. 2590 (1991) (federal courts look through to last reasoned state court

21   judgment to determine whether claim is procedurally barred); answer amended petition, exhibit

22   D (unreasoned decision by California Supreme Court denying petition for review).

23           Based on concerns of comity and federalism, federal courts will not review a

24   habeas petitioner's claims if the state court decision denying relief rests on a state law ground

25   that is independent of federal law and adequate to support the judgment.  Coleman v. Thompson,

26   501 U.S. 722, 111 S. Ct. 2546, 2554 (1991); Harris v. Reed, 489 U.S. 255, 260-62, 109 S. Ct.

1  1038 (1989).  Generally, the only state law grounds meeting these requirements are state

2  procedural rules.  However, the procedural basis of the ruling must be clear.  Ambiguous

3  reference to procedural rules is insufficient for invocation of procedural bar.  Calderon v. United

4  States District Court (Bean), 96 F.3d 1126, 1131 (9th Cir. 1996).  Similarly, where the procedural

5  and merits analysis are intermixed, it cannot be said that the procedural bar is independent of

6  federal law, i.e., there is no plain statement of reliance on procedural bar.  Harris v. Reed, supra.

7           If there is an independent and adequate state ground for the decision, the federal

8  court may still consider the claim if the petitioner demonstrates:  (1) cause for the default and

9  actual prejudice resulting from the alleged violation of federal law, or (2) a fundamental

10  miscarriage of justice.  Harris, 489 U.S. at 262, 109 S. Ct. at 1043.  The existence of cause for a

11  procedural default must ordinarily turn on whether the prisoner can show that some objective

12  factor external to the defense impeded counsel's efforts to comply with the State's procedural

13  rule.  McCleskey v. Zant, 499 U.S. 467, 493-94, 111 S. Ct. 1454, 1476 (1991).  Examples of

14  cause include showings "that the factual or legal basis for a claim was not reasonably available to

15  counsel," "that some interference by officials made compliance impracticable," or "of ineffective

16  assistance of counsel."  Murray, 477 U.S. at 488, 106 S. Ct. at 2645.  Prejudice is difficult to

17  demonstrate:

18           The showing of prejudice required under Wainwright v. Sykes is
          significantly greater than that necessary under "the more vague
19           inquiry suggested by the words 'plain error.'"  Engle, 456 U.S., at
          135, 102 S.Ct., at 1575; Frady, supra, 456 U.S., at 166, 102 S.Ct.,
20           at 1593.  See also Henderson v. Kibbe, 431 U.S. 145, 154, 97 S.Ct.
          1730, 1736, 52 L.Ed.2d 203 (1977).  The habeas petitioner must
21           show "not merely that the errors at ... trial created a possibility of
          prejudice, but that they worked to his actual and substantial
22           disadvantage, infecting his entire trial with error of constitutional
          dimensions."  Frady, supra, at 170, 102 S.Ct., at 1596.

23

24  Murray v Carrier, 477 U.S. at 493-494, 106 S. Ct. at 2648 (1986).

25           Although different phraseology is used in the default context from that used in the

26  ineffective assistance of counsel prejudice inquiry, as stated above, the ultimate application of the

1  two prejudice inquiries is essentially similar—that is, whether the prejudice is sufficient to have

2  undermined the reviewer's confidence in the result of the trial.

3        If the state adequately pleads an independent and adequate state procedural

4  ground, the burden shifts to petitioner to come forward with "specific factual allegations that

5  demonstrate the inadequacy of the state procedure, including citation to authority demonstrating

6  inconsistent application of the rule.  Bennett v. Mueller, 322 F.3d 573, 586 (9th Cir. 2003).

7        By arguing that petitioner waived this claim by failing to object, the state has met

8  its burden of pleading an independent and adequate state procedural ground.  Petitioner has not

9  come forward with any evidence demonstrating that the rule applied by the state appellate court

10  is not firmly established and not regularly followed by the California courts.

11        The court now considers whether the trial court's alleged failure to conduct the

12  proper balancing test regarding admission of the uncharged acts evidence prejudiced petitioner or

13  resulted in a miscarriage of justice.

14        Cal. Evid. Code § 1101(b) permits admission of evidence that a person committed

15  a crime, civil wrong or other act when relevant to prove some fact (such as motive, opportunity,

16  intent, preparation, plan, knowledge, identity, absence of mistake or accident, etc.) other than his

17  disposition to commit such an act.  In a criminal action in which the defendant is accused of a

18  sexual offense, Cal. Evid. Code § 1108 permits admission of the defendant's commission of

19  another sexual offense to prove his disposition to commit the offense so long as the evidence is

20  not inadmissible pursuant to Cal. Evid. Code § 352.  Section 1108 defines "sexual offense" as a

21  crime under the law of the state.

22        Evidence of other sexual offenses cannot be used in cases where its probative

23  value is substantially outweighed by the possibility that it will consume an undue amount of time

24  or create a substantial danger of undue prejudice, confusion of issues, or misleading the jury.

25  People v. Falsetta, 21 Cal.4th 903, 916-920, 89 Cal.Rptr.2d 847, 855-858 (1999).  In evaluating

26  the admission of such evidence, California courts consider such factors as its nature, relevance

and possible remoteness, the degree of certainty of its commission and the likelihood of

confusing, misleading or distracting the jurors from their main inquiry, its similarity to the

charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in

defending against the uncharged offense, and availability of less prejudicial alternatives to its

outright admission, such as admitting some but not all of the defendant's other sex offenses, or

excluding irrelevant though inflammatory details surrounding the offense.  Id. at 916-917, 89

Cal.Rptr.2d at 855-856.  The probative value or other crimes offenses is increased by the relative

similarity between the charged and uncharged offenses, the close proximity in time of the

offenses, and the independent sources of evidence (the victims) in each offense.  Id. at 917, 89

Cal.Rptr.2d at 856.

Had the trial judge performed the balancing test, he still most likely would have

found the evidence involving petitioner performing oral sex on Amber and rubbing her genitals

admissible.  These incidents, involving criminal offenses, occurred in close proximity to the time

of the charged offenses because they occurred during Amber's visits to Dunsmuir.  These

uncharged offenses were also similar in nature to the charged offenses.  Robert was an

independent source as to the incident involving oral sex.  RT at 110-111.  Evidence of these

incidents was also not likely to have confused the jury.  Accordingly, petitioner was not

prejudiced nor did any violation of fundamental fairness occur as a result of the trial court's

failure to conduct the proper balancing test.

Evidence that petitioner pointed and laughed at a picture of a naked woman in his

children's presence and left out pornographic magazines for his son were not crimes. Therefore,

these incidents were not admissible under Cal. Evid. Code § 1108 to prove petitioner's

disposition.  That petitioner laughed at a probably cartoonish picture of a naked women in front

of  his children does not go far, if at all, in terms of an intent issue, and is simply character

evidence introduced by an overzealous prosecutor.  As such it should not have been admitted, but

this rather de minimis misconduct cannot be said to rise to the level of verdict influencing.  It did

1  not "infect" the trial.  In light of the other graphic, admissible evidence, the same can be said for

2  the magazines.

3          Petitioner also argues that the trial court failed to give sufficient limiting

4  instructions to the jury regarding the uncharged offenses.  The California Court of Appeal

5  addressed the merits of this claim.  Petitioner's counsel initially told the court that he intended to

6  submit an instruction regarding the uncharged acts.  Answer to Amended Petition, Exhibit B, pp.

7  14-15.  The court directed counsel to CALJIC Nos. 2.50 and 2.50.1 and stated that it remained

8  open to "such an instruction at a later time if one is presented."  Id., p. 15.  According to the

9  Court of Appeal, defense counsel requested but then withdrew requests for 2.50 and 2.50.1.

10  Opinion at 15 n.5.  The court later instructed the jury with a modified version of CALJIC No.

11  10.43:

12          Evidence has been introduced for the purpose of showing lewd or lascivious acts
            outside of Siskiyou County between the defendant and the alleged victim on one
13          or more occasion other than that charged in this case.

14          If you believe this evidence, you may use it only for the limited purpose of tending
            to show that defendant's lewd disposition or intent toward the child.
15
16          You must not consider that evidence for any other purpose.

17  CT at 204.

18          Petitioner is apparently claiming that the trial court should have sua sponte

19  instructed the jury as to CALJIC No. 2.50 and CALJIC 2.50.1.  CALJIC 2.50 addresses evidence

20  of other crimes.  CALJIC 2.50.1 addresses introduction of other evidence of other sexual

21  offenses and would be the more relevant instruction.  CALJIC 2.50.1 provides, in relevant part,

22          If you find that the defendant committed a prior sexual offense, you may, but are
            not required to, infer that the defendant had a disposition to commit sexual
23          offenses.  If you find that the defendant had this disposition, you may, but are not
            required to, infer that he was likely to commit and did commit the crimes of which
24          he is accused.

25          A challenge to jury instructions does not generally state a federal constitutional

26  claim.  See Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983); see also Middleton v.

14

1   Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  Habeas corpus is unavailable for alleged error in the

2   interpretation or application of state law.  Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475

3   (1981); see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786

4   F.2d 1378, 1381 (9th Cir. 1986).  The standard of review for a federal habeas court "is limited to

5   deciding whether a conviction violated the Constitution, laws, or treaties of the United States

6   (citations omitted)."  Estelle v. McGuire, 502 U.S. at 68, 112 S. Ct. at 480.  In order for error in

7   the state trial proceedings to reach the level of a due process violation, the error had to be one

8   involving "fundamental fairness."  Id. at 73, 112 S. Ct. at 482.  The Supreme Court has defined

9   the category of infractions that violate fundamental fairness very narrowly.  Id. at 73, 112 S. Ct.

10   at 482.

11          Where what is at issue is the failure to give an instruction, petitioner's burden is

12   "especially heavy" because it has been held that "[a]n omission or an incomplete instruction is

13   less likely to be prejudicial than a misstatement of the law."  Henderson v. Kibbe, 431 U.S. 145,

14   155, 97 S. Ct. 1730, 1737 (1977).  Moreover, a trial judge need not instruct on a defense which

15   would be inconsistent with petitioner's theory of the case.  Bashor v. Risley, 730 F.2d 1228, 1240

16   (9th Cir. 1984).  Failure to give a jury instruction under these circumstances will not amount to a

17   due process violation.  Id.

18          The burden upon petitioner is greater yet in a situation where he claims that the

19   trial court did not give an instruction sua sponte.  To the extent that petitioner rests his claim on a

20   duty to give an instruction sua sponte under rules of state law, petitioner has stated no federal

21   claim.  Indeed, in the failure to give a lesser included offense instruction context, the Ninth

22   Circuit has flatly held in non-capital cases that the failure to give the instruction states no federal

23   claim whatsoever.  James v. Reece, 546 F.2d 325, 327 (9th Cir. 1976).  Therefore, in order to

24   violate due process, the impact on the proceeding from failure to give an instruction sua sponte

25   must be of a very substantial magnitude.

26   \\\\\

15

1    Furthermore, the Supreme Court has recently held that there is no unreasonable

2   application of federal law where a state appellate court decided that a jury instruction's single

3   incorrect statement of the "imperfect self-defense" standard did not render the instruction

4   reasonably likely to have misled the jury.  Middleton v. McNeil, 541 U.S. 433, 124 S. Ct. 1830

5   (2004).

6    The instruction given adequately informed the jury that it could consider the

7   evidence of uncharged crimes as tending to show petitioner's disposition to commit the charged

8   crimes.  The error generally involved with sex offense instructions concerns the burden of proof.

9   If not carefully given, the jury may be misdirected to a preponderance standard for the crime at

10  issue, and not just the other sexual offenses.  See Gibson v. Ortiz, 387 F.3d 812 (9th Cir. 2004).

11  However, simply informing the jury that it can use the evidence in determining intent, without

12  instructing on the burden of proof for those offenses does not present a problem, assuming the

13  admissibility of the evidence in the first place.  Gibson, 387 F.3d at 822.  Moreover, in situations

14  where counsel is aware of all the instructions he would like, but decides to withdraw the

15  instructions, one cannot fault the judge from a due process standpoint from not giving the

16  withdrawn instructions sua sponte.  The trial court's failure to sua sponte give CALJIC No.

17  2.50.1 did not violate fundamental fairness.

18    Because the denial of this claim by the California Supreme Court was not an

19  unreasonable application of clearly established Supreme Court authority, this claim should be

20  denied.

21    D.  Ineffective Assistance of Counsel

22    *Legal Standard*

23    The test for demonstrating ineffective assistance of counsel is set forth in

24  Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).  First, a petitioner must show

25  that, considering all the circumstances, counsel's performance fell below an objective standard of

26  reasonableness.  Strickland, 466 U.S. at 688, 104 S. Ct. at 2065.  To this end, the petitioner must

identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. Id. at 690, 104 S. Ct. at 2066.  The federal court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. Id., 104 S. Ct. at 2066.  "We strongly presume that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689, 104 S. Ct. at 2065).

Second, a petitioner must affirmatively prove prejudice. Strickland, 466 U.S. at 693, 104 S. Ct. at 2067.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id., 104 S. Ct. at 2068.

In extraordinary cases, ineffective assistance of counsel claims are evaluated based on a fundamental fairness standard. Williams v. Taylor , 529 U.S. 362, 391-93, 120 S. Ct. 1495, 1512-13 (2000), (citing Lockhart v. Fretwell, 113 S. Ct. 838, 506 U.S. 364 (1993)).

The Supreme Court has recently emphasized the importance of giving deference to trial counsel's decisions, especially in the AEDPA context:

> In Strickland we said that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S., at 689, 104 S.Ct. 2052.  Thus, even when a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a [petitioner] must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Ibid. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).
>
> For [petitioner] to succeed, however, he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly.  See Williams, supra, at 411, 65 S. Ct. 363.  Rather, he must show

1     that the [ ]Court of Appeals applied <u>Strickland</u> to the facts of his case in an
2     objectively unreasonable manner.

3     <u>Bell v. Cone</u>, 535 U.S. 685, 698-699, 122 S. Ct. 1843,1852 (2002).

4              *Analysis*

5              Petitioner argues that his counsel was ineffective for failing to object to admission

6     of evidence regarding the uncharged acts.  Petitioner observes that this evidence was not

7     admitted at his first trial, which resulted in a mistrial.  CT at 75 (minutes showing mistrial as a

8     result of hung jury.)  Petitioner argues he was prejudiced by the admission of this evidence at his

9     second trial because he was convicted.  As discussed above, the evidence that petitioner

10    performed oral sex on Amber and touched her inappropriately during camping trips was most

11    likely admissible under Cal. Evid. Code § 1108.  Therefore, petitioner was not prejudiced by

12    counsel's failure to object to this evidence.

13             As discussed above, the evidence that petitioner pointed at the picture of the

14    naked woman and left out pornographic magazines for his son was not admissible pursuant to

15    Cal. Evid. Code § 1108.  This evidence was also not admissible pursuant to Cal. Evid. Code §

16    1101 because neither of these incidents tended to show any fact such as petitioner's intent to

17    molest Amber.

18             While this evidence was not particularly relevant to any issue in the case,

19    petitioner was not prejudiced by its admission.  Although this evidence, at best, demonstrated

20    inappropriate behavior by petitioner around his children regarding sexual matters, it was

21    significantly "tamer" then the evidence regarding his molestation of Amber.  It is very unlikely

22    that evidence of these milder incidents influenced the jury in its decision.

23             For the reasons discussed above, the court finds that petitioner was not prejudiced

24    by counsel's failure to object to the "other acts" evidence.  After conducting an independent

25    review of the record, the court finds that the decision by the California Supreme Court denying

26    this claim was not objectively unreasonable.

18

1          E.  Prosecutorial Misconduct

2          *Legal Standard*

3          Success on a claim of prosecutorial misconduct requires a showing that the

4  conduct infected the trial with unfairness as to make the resulting conviction a denial of due

5  process.  Greer v. Miller, 483 U.S. 756, 765, 107 S. Ct. 3102, 3109 (1987) (quoting Donnelly v.

6  DeChristoforo, 416 U.S. 637, 643, 94 S. Ct. 1868, 1871 (1974)).  The conduct must be examined

7  to determine "whether, considered in the context of the entire trial, that conduct appears likely to

8  have affected the jury's discharge of its duty to judge the evidence fairly."  United States v.

9  Simtob, 901 F.2d 799, 806 (9th Cir. 1990).

10          The appropriate standard of review for a claim of prosecutorial misconduct on a

11 writ of habeas corpus is "the narrow one of due process, and not the broad exercise of

12 supervisory power."  Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471 (1986)

13 (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 642, 94 S. Ct. 1868, 1871 (1974)).

14 According to the Supreme Court, "the touchstone of due process analysis in cases of alleged

15 prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."  Smith

16 v. Phillips, 455 U.S. 209, 219, 102 S. Ct. 940, 947 (1982).  Thus, the federal habeas court must

17 distinguish between "ordinary trial error of a prosecutor and that sort of egregious

18 misconduct . . . amount[ing] to a denial of constitutional due process."  Id., 102 S. Ct. at 947.

19          Improper prosecutorial argument violates rights under the federal
20    constitution if it "'so infected the trial with unfairness as to make
      the resulting conviction a denial of due process.'"  Darden v.
21    Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144
      (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94
22    S.Ct. 1868, 40 L.Ed.2d 431 (1974)).  It "is not enough that the
      prosecutors' remarks were undesirable or even universally
23    condemned."  Id. (internal quotation marks omitted).

24 Allen v. Woodford, 395 F.3d 979, 997-998 (9th Cir. 2004).

25 \\\\\

26 \\\\\

1        *Analysis*

2               Petitioner cites four instances of alleged prosecutorial misconduct during closing

3    argument.  First, the prosecutor referred to the jury as sanitation workers and to petitioner as

4    garbage.  In his closing argument the prosecutor stated,

5               You know, in a case like this, I feel like your job is similar to that of–if you will
                pardon me for saying this, of a sanitation worker.  You have to come face to face
6               with some–some true filth.  And you have to confront it and you have to do
                something about it.

7
                Sanitation workers, garbage collectors, sewage system workers, they have my
8               deepest respect.  That is honorable work.  And imagine what our society would be
                like if we didn't have people doing that work.

9
                And the same thing goes for you.  This is a tough, tough case.  It is ugly stuff to
10              have to listen to and think about it.  Think what our society would be like if we
                didn't have people who had the courage and integrity to think through it and do
11              the right thing.

12   RT at 810-811.

13              Later in his rebuttal the prosecutor stated,

14              Ladies and gentlemen, to use my previous analogy, it is time to take out the
                garbage.  Mr. King says his client is a human being.  Anybody who could do those
15              things is human garbage.  The only people who can do anything about it are you.

16   RT at 876.

17              There is no excuse for the prosecutor's statement here concerning his personal

18   opinion on the worth of the petitioner (defendant).  It is one thing to call the crime "filth," and

19   that the jury must feel like sanitation workers; it is quite another to call the defendant "human

20   garbage."  The Court of Appeal focused on the former comments and ignored the comment on

21   petitioner's worth.  If trials are not simply to degenerate into a name calling contest, the

22   prosecutor's comment should be condemned.

23              And, if this had been a federal trial in the Ninth Circuit, the comments may well

24   have caused a retrial.  See United States v. Weatherspoon, __F.3d__, 2005 WL 1384341(9th Cir.

25   2005) (argument that jury should convict to alleviate social problems, i.e., convicting the

26   defendant will make you (the jury) feel comfortable because the defendant will be off the street)

                                              20

1   inappropriate and reversible); <u>United States v. Brown</u>, 327 F.3d 867, 872 (9th Cir. 2003)

2   (comment that if defendant cheated in one area he cheated in the one at issue, improper character

3   statement and inflammatory).  However, the standards are set by the Supreme Court and the

4   undersigned cannot say that the Supreme Court standard has been exceeded.

5            In <u>Darden v. Wainwright</u>, 477 U.S. 168, 181, 106 S. Ct. 2464 (1986) the Supreme

6   Court found that the petitioner was not deprived of a fair trial despite the prosecutor's

7   inflammatory and offensive remarks when the weight of the evidence supported the verdict and

8   the trial court instructed the jury that closing arguments were not evidence.  In <u>Darden</u>, the

9   prosecutor's inappropriate comments during closing argument were more numerous and just as

10  inappropriate, if not more so, then the comments made in the instant case.  <u>See</u> 477 U.S. at 181 n.

11  9, n. 10, n. 11, n. 12, 106 S. Ct. at 2471.[2]  If a prosecutor's statement that a defendant is an

12  animal who should not be let out except on a leash, and that he wished the defendant's face had

13  been blown off with a shotgun, the human garbage statement will not go beyond the line set by

14  the Supreme Court.

15  \\\\\

16

---

17          [2]  The prosecutor in <u>Darden</u>, a death penalty case, made the following improper
    statements during closing argument:
18  "As far as I'm concerned, there should be another defendant in this courtroom, one more, and
    that is the division of corrections, the prisons...Can't we expect him to stay in a prison when they
19  go there?  Can we expect them to stay locked up once they go there?  Do we know that they're
    going to be out on the public with guns, drinking?"  477 U.S. at 181 n. 9, 106 S.Ct. at 2471.
20  "Yes, there is another defendant, but I regret that I know of no charges to place upon him, except
    the public condemnation of them, condemn them."  <u>Id.</u>
21  "I will ask you to advise the Court to give him death.  That's the only way that I know that he is
    not going to get out on the public.  It's the only way I know.  It's the only way I can be sure of it.
22  It's the only way that anybody can be sure of it now, because the people that turned him
    loose.—" <u>Id.</u>, n. 10, 94 S.Ct. at 1871.
23  "As far as I am concerned, and as Mr. Maloney said as he identified this man this person, as an
    animal, this animal was on the public for one reason."  <u>Id.</u>, n. 11, 94 S.Ct. at 1871.
24  "He shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end
    that leash."  <u>Id.</u>, n. 12, 94 S.Ct. at 1871.
25  "I wish [Mr. Turman] had had a shotgun in his hand when he walked in the back door and blown
    his [Darden's] face off.  I wish that I could see him sitting here with no face, blown away by a
26  shotgun."  <u>Id.</u>

1         In the instant case, the court instructed the jury that closing argument was not

2    evidence.  RT at 809.  In addition, the weight of the evidence supported the verdict.  Amber

3    testified that petitioner repeatedly molested her.  Three of Amber's friends testified that she told

4    them that her father had molested her.  See RT at 170-172 (Jeremy Day); RT at 319-320 (Shanna

5    Brunridge); RT at 439-440 (Carrie Harris).  Amber's brother, Rob, also testified that he

6    witnessed some of the incidents.  Because the jury was instructed that closing argument was not

7    evidence and because the evidence supported the verdict, the court finds that the inflammatory

8    comments by the prosecutor did not violate petitioner's right to a fair trial.

9         Petitioner next argues that the prosecutor committed misconduct when he told the

10   jury that if they voted for not guilty, they would be calling Amber a liar: "If even one of you were

11   not to–were to call Amber a liar through your verdict, it just–just wouldn't do her justice,

12   wouldn't do Rob justice.  I am just asking you to do justice."  RT at 877.

13        The prosecutor again crossed the line of appropriate argument.  Telling the jury

14   that an acquittal means that the victim was a "liar" was simply an inappropriate pressure tactic

15   that should be avoided.  Of course, the jury could acquit without finding the victim a liar.

16   Victims can be confused, inarticulate, not persuasive to "beyond a reasonable doubt"– they do

17   not have to be liars for a defendant to be acquitted.  But nevertheless, the undersigned cannot find

18   that such a tactic was beyond the due process bar set by the Supreme Court.

19        Petitioner next argues that the prosecutor improperly reminded the jury that

20   Amber had already twice testified:

21        Now, in addition to having no motivation to tell such a lie, there have been
          strong–strong reasons for Amber and Rob not to tell such a lie.  Think about this.
22        What have been the impacts on Amber?

23        First of all, she has had to sit through two trials in which she has accused her own
          father of horrendous sexual abuse.  I don't know if that sounds like fun to any of
24        you, but if you can imagine sitting in court through two trials and accusing your
          father of sexual abuse for no reason and it is a total lie, you are a unique
25        individual.

26   \\\\\

1

2           Secondly, she has had to inconvenience her family and friends, her mother,
            brother, her friends and acquaintances.  They have come all the way to Yreka
            from as far away as Sacramento.  That was Jeremy Day.  As near as Redding,
3           most of them came from Redding. They had to testify under oath and be cross
            examined by Mr. King.

4           So if she is lying, she is just imposing that on them for no reason.  And she herself
            had to testify under oath at each trial in front of strangers.

5

6   RT at 817-818.

7           The jury knew that petitioner had been previously tried for the offense based on

8   the cross-examination of witnesses.  For example, Amber's mother testified that she spoke with

9   her son, Rob, about the details of petitioner's conduct a little before the first trial and more before

10  the second trial.  RT at 357.  Because the jury knew that Amber had already testified against

11  petitioner in a previous trial, the prosecutor did not misstate evidence or otherwise commit

12  misconduct by referring to the previous trial.

13          In addition, the prosecutor's argument regarding Amber's testimony in the first

14  trial was that her willingness to get up and testify against her father in two trials demonstrated her

15  credibility.  This was not an improper argument.  As noted by the California Court of Appeal, the

16  prosecutor did not ask the jury to convict so that she would not have to testify again.

17  Accordingly, this claim of prosecutorial misconduct is without merit.

18          Finally, petitioner argues that the prosecutor misstated the law regarding the

19  presumption of innocence:

20          A of [sic] couple of preliminary comments about our system of law and some of
            the rules you have been presented with.  Everyone is familiar with the
21          presumption of innocence in the American system of justice.
            Well, what's the purpose of that?  There are some places in the world, as you
22          undoubtedly know, where there is no presumption of innocence.  If the ruling
            junta or whatever it is decides to put something on trial, or whatever it is, you
23          prove you are not guilty.  If you don't do that, you are convicted.
            That's not the way it is in the United States of America.  There is nothing for you
24          to conclude from the fact that the defendant has been charged with a crime, has
            been brought to trial, or so forth.  That is no evidence of anything.
25          So you might recall when we were selecting the jury that there was a lady that I
            asked, "What would you do if you had to decide right now which way you were
26          going to vote, guilty or not guilty?"

                                            23

1    She said, "Can I have another choice?"
     I said, "No, guilty or not guilty."
2    She said, "I would have to vote not guilty."
     That is absolutely right, because at that point, there was no evidence before you.
3    The defendant is presumed innocent until the contrary is proved. But as Judge
     Kaster just told you a moment ago, you have heard all the evidence. All the
4    evidence is before you, and I submit to you, ladies and gentleman, the contrary has
     been proved.
5    So you do not at this point have to go through some artificial mental exercise and
     try to think in your mind, "He is not guilty. I am going to presume he is not
6    guilty," until you go back to deliberate. That is not the way it works.
     It has been proven to you. The presumption of innocence is at the beginning of the
7    trial. After the evidence, it is not there anymore. You analyze the evidence.
     There is a correlary to the presumption of evidence. That is, that the defendant is
8    not required to prove or disprove anything. That's true.

9    RT at 811-812.

10          In the amended petition, petitioner argues that the prosecutor misstated the law

11   when he argued, "So you do not at this point have to go through some artificial mental exercise

12   and try to think in your mind 'he is not guilty. I'm going to presume he is not guilty,' until you

13   go back to deliberate.'" Amended Petition, p. 26. Standing alone, this statement is confusing.

14   However, taken in the context of the entire argument quoted above, the statement referred to the

15   prosecutor's conversation with the potential juror during voir dire. The prosecutor's point was

16   that before the evidence was presented, the jury would have to have found petitioner not guilty.

17   After the jury was presented with evidence, the jury would have evidence before it on which to

18   find petitioner guilty. The prosecutor's argument did not misstate the legal standard.

19          The denial of petitioner's prosecutorial misconduct claim by the California

20   Supreme Court was not an unreasonable application of clearly established Supreme Court

21   authority. Accordingly, this claim should be denied.

22          Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

23   a writ of habeas corpus be denied.

24          These findings and recommendations are submitted to the United States District

25   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty

26   days after being served with these findings and recommendations, any party may file written

1   objections with the court and serve a copy on all parties.  Such a document should be captioned

2   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

3   shall be served and filed within ten days after service of the objections.  The parties are advised

4   that failure to file objections within the specified time may waive the right to appeal the District

5   Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

6   DATED: 7/1/05

7

8                                                    /s/ Gregory G. Hollows

9                                                    _____
                                                     GREGORY G. HOLLOWS
                                                     UNITED STATES MAGISTRATE JUDGE

10

11  ggh:kj
    sch96.157

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26